CENTURY FIRE SPRINKLERS, INC., Appellant,

v.

CNA/TRANSPORTATION INSURANCE COMPANY, Respondent.

No. WD 60310.

Missouri Court of Appeals, Western District.

Oct. 29, 2002.

Anthony J. Romano, Mishca L. Walic-zek, Kansas City, for appellant.

Michael W. Shunk, Overland Park, KS, for respondent.

Before HOWARD, P.J., and EDWIN H. SMITH and NEWTON, JJ.

VICTOR C. HOWARD, Presiding Judge.

Century Fire Sprinklers ("Century") appeals following the trial court's order granting CNA/Transportation Insurance Company's ("CNA") second motion for summary judgment. Century raises four points on appeal. First, Century claims the trial court erred in allowing CNA to amend its answer to add the "business risk" exclusions as affirmative defenses. Second, Century contends the trial court erred in granting CNA's second motion for summary judgment pursuant to the "law of the case" doctrine. Third, Century claims the trial court erred in granting CNA's second motion for summary judgment under principles of res judicata. Fourth, Century contends the trial court erred in granting CNA's first motion for summary judgment on the basis that the "business risk" exclusions excluded coverage for the property damage alleged in the underlying suit.

We reverse and remand.

### Facts

This appeal follows the trial court's order granting CNA's second motion for summary judgment in favor of CNA and against Century. Century initially filed suit against CNA on or about August 12, 1998, for breach of contract and vexatious refusal to pay arising from CNA's refusal to assume the defense of a lawsuit brought against Century.

Century is a corporation engaged in the design, engineering and installation of fire suppression systems in buildings. CNA, a commercial insurance company, underwrote and issued a policy of commercial general liability insurance ("policy") to Century.

Subsection 1(a) of Section I.A. of the policy provides that CNA "will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." Further, subsection I.A.1(b) provides that the policy applies to "bodily injury" and "property damage" if the bodily injury or property damage was caused by an "occurrence" as defined in the policy, and so long as the bodily injury or property damage occurred during the policy period and within the geographical area contemplated by the policy. Subsection 1(a) further requires CNA to defend Century against any suit seeking damages insured under the policy.

Section V, the definitions section, provides, in relevant part, as follows:

5. "Impaired property" means tangible property, other than "your product" or "your work," that cannot be used or is less useful because:

a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous;

or

b. You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by:

a. The repair, replacement, adjustment or removal of "your product" or "your work;" or

b. Your fulfilling the terms of the contract or agreement.

6. "Insured contract" means:

\* \* \*

f. That part of any other contract or agreement pertaining to your business ... under which you assume the tort liability of another party to pay for "bod-

ily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

\* \* \*

12. "Property damage" means:

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured. All such loss shall be deemed to occur at the time of the "occurrence" that caused it.

\* \* \*

14. "Your product" means:

a. Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

(1) You                    .

. . . .

"Your product" includes

a. Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product;"

. . .

15. "Your work" means:

a. Work or operations performed by you or on your behalf; and

b. Materials, parts or equipment furnished in connection with such work or operations.

"Your work" includes:

a. Warranties, or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work. . . ."

\*    \*    \*    \*    \*    \*

Section V, subsection 9 of the policy defines "occurrence" to mean "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Under subsection 12(b) of Section V of the policy, "Property Damage" is defined to include "[l]oss of use of tangible property that is not physically injured. . . ."

During the policy period, Century, as a subcontractor for Clayco Construction Company, designed, engineered and installed a fire sprinkler system in a building in St. Louis County, Missouri. Also during the policy period, in October 1994, Clayco instituted legal proceedings against Century by filing a petition in the Circuit Court of St. Louis County, Missouri ("Clayco lawsuit").

The Clayco lawsuit arose from a July 22, 1992 contract between Clayco and Century for the design, engineering and installation of a fire protection system as part of certain improvements to be made to certain real property located in St. Louis County, Missouri. Century subcontracted the design and engineering services for the fire protection system to a professional engineer.

The Clayco lawsuit alleged that "the relevant governmental authorities had rejected the fire protection system as designed in that it was insufficient for the kind of facility in which it was installed." Count I of the Clayco lawsuit alleged that Century breached its subcontract with Clayco in that Century "failed to properly design the fire protection system so that it would be accepted by the relevant governmental authorities," and it failed and refused to remedy its errors and omissions in the design of the system. Count II of the Clayco lawsuit alleged that Century "was negligent by failing to properly perform its professional obligations to design a fire protection system that would be accepted

by the relevant governmental authorities to accept or reject same, and by failing to notify Clayco that the system as designed and installed would not be sufficient to pass the required inspections. . . ." Clayco claimed it was damaged "in that it has been forced to engage a new contractor to redesign and install the fire protection system, and has been forced to expend attorneys fees, costs and expenses associated with Century's errors and omissions. . . ."

On or about October 21, 1994, Century tendered its defense of the Clayco lawsuit to CNA. On or about December 9, 1994, CNA declined to defend or indemnify Century against Clayco's lawsuit. Clayco subsequently dismissed its suit and later refiled it. On November 20, 1996, Century again tendered its defense of the suit to CNA. On December 13, 1996, CNA again declined to defend or indemnify Century against the lawsuit.

On August 12, 1998, Century filed a lawsuit for breach of contract and vexatious refusal to pay against CNA, alleging that CNA wrongfully refused to assume Century's defense in the Clayco lawsuit. On or about June 9, 1999, the trial court granted CNA's first motion for summary judgment in favor of CNA and against Century. The court found that the "business risk" exclusions in the policy excluded coverage. CNA, however, did not plead the "business risk" exclusions as affirmative defenses to Century's claims in its answer. Century subsequently appealed the trial court's judgment, arguing that CNA waived its right to assert the "business risk" exclusions as set forth in the policy because CNA failed to raise the exclusions as affirmative defenses to Century's petition. Century also argued that the trial court erred in ruling that the business risk exclusions excluded even the potential for coverage under the claims asserted against Century in the Clayco lawsuit.

On June 27, 2000, this court held that an insurance policy exclusion is an affirmative defense that must be pled or it may be waived. *Century Fire Sprinklers, Inc. v. CNA/Transp. Ins. Co.*, 23 S.W.3d 874, 879 (Mo.App. W.D.2000) (*"Century I"*). This court reversed the trial court's judgment and remanded to the trial court "to exercise its sound discretion as to whether to allow CNA to so amend" its answer to plead the business risk exclusions as affirmative defenses. *Id.* at 880. This court did not address the issue of coverage under the policy, other than to state that "it appears that the policy language in question does exclude the claims raised by the party suing Century." *Id.* at 878–79.

On September 5, 2000, CNA filed with the trial court a motion for leave to amend its answer to include the business risk exclusions as affirmative defenses to Century's petition. On September 14, 2000, Century filed suggestions in opposition to CNA's motion for leave to amend. Century argued that 1) as a matter of law, the *Hounihan* exception to Rule 55.33 prohibited CNA from amending its answer; and 2) notwithstanding the *Hounihan* exception, CNA should not be allowed to amend its answer pursuant to Rule 55.33. On December 4, 2000, the trial court sustained CNA's motion for leave to amend its answer to add the business risk exclusions as affirmative defenses.

On December 11, 2000, CNA filed its first amended answer and included as affirmative defenses to Century's petition the business risk exclusions contained in the policy.

The business risk exclusions relied on by CNA are set forth in the policy as follows:

   2.   Exclusions.

   This insurance does not apply to:

\* \* \*

k. "Property damage" to "your product" arising out of it or any part of it.

l. "Property damage" to "your work" arising out of it or any part of it and excluded in the "products-completed operations hazard."

This exclusion does not apply if the damage work or the work out of which the damage arises was performed on your behalf by a subcontractor.

m. "Property damage" to "impaired property" or property that has not been physically injured, arising out of

(1) A defect, deficiency, inadequacy or dangerous condition in "your Product" or "your work;" or

(2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

n. Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

(1) "Your product;"

(2) "Your work;" or

(3) "Impaired property;"

If such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

\* \* \* \* \* \*

The policy also contains a professional services endorsement. Endorsement G–18085–A to the policy is entitled "Fire Suppression Systems Repair and Installation" and states as follows:

The insurance does not apply to "bodily injury," "property damage," "personal injury," or "advertising injury" arising out of the rendering or failure to render any professional services by or for you, including

1. The preparing, approving, or failing to prepare or approve maps, drawings, opinions, reports, surveys, change orders, designs or specifications, and

2. Supervisory inspection or engineering services.

This exclusion does not apply to "bodily injury," "property damage," "personal injury," or "advertising injury" arising out of services provided by you that are in conjunction with repair or installation work you performed in conjunction with fire suppression systems.

\* \* \* \* \* \*

CNA did not plead Endorsement G–18085–A as an affirmative defense to Century's petition.

On December 11, 2000, CNA filed its second motion for summary judgment. CNA argued that it was entitled to summary judgment on two bases. First, CNA claimed that the trial court's decision on CNA's first motion for summary judgment with respect to coverage constituted the "law of the case." Second, CNA argued that Century's claims were barred by principles of res judicata. In its opposition to CNA's second motion for summary judgment, Century argued that 1) the doctrine of the "law of the case" is limited to cases in which the issue in controversy was raised and decided in a prior appeal; 2) Century was not barred by res judicata because there was no final judgment on the merits involving the same claims; and 3) the business risk exclusions relied on by

CNA did not exclude coverage for the loss claimed by Century.

On July 13, 2001, the trial court granted CNA's second motion for summary judgment. The trial court held that the court's ruling on the coverage issue in CNA's first motion for summary judgment remained the law of the case. The trial court further held that res judicata barred relitigation of the same cause of action by the same parties in this case in that the two actions contained the following identities: 1) identity of the things sued for; 2) identity of the cause of action; 3) identity of the parties to the action; and 4) identity of the quality of the person for or against whom the claim is made.

This appeal follows.

### Standard of Review

On appeal from the grant of a motion for summary judgment, our review is essentially de novo. *ITT Commercial Fin. Corp. v. Mid–Am. Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993). We view the record in the light most favorable to the party against whom summary judgment was taken. *Id.* "The non-moving party is granted the benefit of all reasonable inferences from the record." *Schoettger v. Am. Nat'l Prop. & Cas. Co.*, 10 S.W.3d 566, 567–68. "Summary judgment is only appropriate where the moving party demonstrates that no genuine issue of material fact exists, and the movant is entitled to a judgment as a matter of law." *Id.* at 568.

### I. Propriety of Allowing CNA to Amend

Century's first point on appeal is that the trial court erred in allowing CNA to amend its answer to add the "business risk" exclusions as affirmative defenses, because as a matter of law the *Hounihan* exception to Rule 55.33 prohibits an insurer from amending its answer to add an affirmative defense not previously alleged. Century further argues that even if this court were to find that the *Hounihan* exception does not apply in this case, the trial court abused its discretion in allowing CNA to amend its answer pursuant to Rule 55.33.

In its judgment, the trial court acknowledged Century's argument in regard to the "so-called '*Hounihan*' exception," but stated that in *Green v. City of St. Louis*, 870 S.W.2d 794 (Mo. banc 1994), the Missouri Supreme Court effectively abrogated the notion that as a matter of law, an insurer is absolutely prohibited from asserting defenses not alleged in its initial answer. Then, as a result of its own analysis and the mandate from this court, the trial court applied the three-factor analysis set forth in *Green*, finding that 1) CNA would incur sufficient hardship if not allowed to amend, in that it would be unable to assert a valid contractual defense which may be dispositive of the case; 2) CNA felt it was not required to raise the issue of the policy exclusions as affirmative defenses in its original answer, the issue of policy exclusions as affirmative defenses was not raised until Century's response to CNA's cross-motion for summary judgment, and undisputed evidence showed that Century was aware that CNA intended to use the policy exclusions as a defense from the onset of the litigation; and 3) Century would not suffer undue prejudice if CNA was allowed to amend because Century was aware of CNA's planned use of the policy exclusions as a defense from the onset of the litigation. The court concluded that CNA met its burden of persuasion on each of the three elements and granted CNA leave to amend its answer to include the "business risk" exclusions.

### A. The *"Hounihan* Exception"

We first consider Century's argument that in the context of insurance coverage

cases, Missouri courts have established an exception to the general rules for amendment of pleadings set forth in Rule 55.33. The balancing test usually implemented under Rule 55.33 and applied by the trial court in this case does not apply in the insurance context, Century claims, because of the *Hounihan* rule. Thus, Century argues, the trial court's ruling granting CNA leave to amend its answer on remand is contrary to Missouri law and constitutes reversible error.

In *Hounihan v. Farm Bureau Mutual Insurance Co. of Missouri*, 523 S.W.2d 173 (Mo.App.1975), an insurer denied liability under an insured's fire insurance policy. The insurer initially denied liability because of foul play, suspicious circumstances, and because it thought the fire was intentionally set by the insured. *Hounihan*, 523 S.W.2d at 174. In its original answer to the insured's suit on the policy, the insurer denied the fact of loss of the insured property, denied notice of the fire loss, and denied it had denied liability under the policy or refused to pay the loss. *Id.* at 174–75. The insurer later amended its answer to add the affirmative defense that the insured increased the hazard insured against by means within his control and knowledge. *Id.* at 175. The court held that the trial court did not err in finding for the insured because it was at liberty to disbelieve the insurer's contradictory evidence on its affirmative defense. *Id.* The court further stated that "by first denying liability as above set forth, the defendant was foreclosed from later advancing a different ground for denying coverage." *Id.* *Hounihan* did not directly involve the procedural issue of whether the

insurer could amend its answer to assert an additional affirmative defense.

*Calvert v. Safeco Insurance Co. of America*, 660 S.W.2d 265, 271 (Mo.App. W.D.1983), first coined the phrase "*Hounihan* rule" and mentioned it as an "exception" to Rule 55.33. That case involved the question of whether an insurance company was precluded from amending its pleadings on remand to include a new affirmative defense not previously relied on to deny coverage. *Calvert*, 660 S.W.2d at 271. The court cited *Hounihan* for the "relevant general rule" that by first denying liability based on a particular defense, a defendant is foreclosed from later advancing a different ground for denying coverage.[1] *Id.* The court further stated that "[t]he *Hounihan* rule is a well-established exception to the broader provision of Rule 55.33 which states that a court should, within its discretion, liberally allow amendments to pleadings." *Id.* The court went on to state that *Kammeyer v. Concordia Telephone Co.*, 446 S.W.2d 486, 490 (Mo.App.1969), "added a twist to the general rule followed in *Hounihan*" when it stated that this rule of preclusion applied *at least if the original denial was made with full knowledge of the facts. Id.*

The parties are in sharp disagreement regarding the *Calvert* court's statement that the *Hounihan* holding is an "exception to the broader provision of Rule 55.33" which liberally allows amendments to pleadings. Some confusion arises because of the distinction and the interplay between rules regarding the substantive concepts of estoppel and waiver and the procedural rules which concern the ability of a party to amend its pleadings to add an affirmative defense. References to the

---

1. The court erroneously stated that in *Hounihan* the defendant unsuccessfully attempted to amend its answer to include a different defense. *Calvert,* 660 S.W.2d at 271. The defendant in *Hounihan* did, in fact, amend its answer to add an affirmative defense. *Hounihan,* 523 S.W.2d at 175.

"*Hounihan* rule" or the "*Hounihan* exception" are not helpful in resolving the confusion.

The supreme court in *Brown v. State Farm Mutual Automobile Insurance Co.*, 776 S.W.2d 384, 388 (Mo. banc 1989), took us on an "extended tour" of the case law of estoppel and waiver in relation to grounds an insurance company may assert to deny coverage. The court noted the frustration when analyzing this area of law, which has arisen when the doctrines of waiver and estoppel, along with the concept of prejudice, have been confusingly intertwined or inconsistently applied. *Brown*, 776 S.W.2d at 388. The court in *Brown* lifted "much of the mist of confusion" by separating and clearly defining the doctrines of waiver and estoppel. *Id.*

Because the general rule that an insurer, having denied liability on a specific ground, may not thereafter shift its denial to a different ground is rooted in the doctrines of waiver and estoppel, the court highlighted the distinction between the two and defined them as follows:

> Classically, estoppel requires "(1) an admission, statement, or act inconsistent with the claim afterwards asserted and sued upon, (2) action by the other party on the faith of such admission, statement, or act, and (3) injury to such other party, resulting from allowing the first party to contradict or repudiate the admission, statement, or act." *Mississippi–Fox Drainage Dist. v. Plenge*, 735 S.W.2d 748, 754 (Mo.App.1987). Waiver is founded upon "the intentional relinquishment of a known right." If waiver is "implied from conduct, the conduct must clearly and unequivocally show a purpose to relinquish the right." *Shapiro v. Shapiro*, 701 S.W.2d 205, 206 (Mo. App.1985).

*Id.* at 386–87. In further emphasizing the distinction between waiver and estoppel, the court stated:

> Waiver involves the act or conduct of one of the parties to the contract only. An estoppel involves the act or conduct of both parties to a contract. A waiver ... involves both knowledge and intent. Estoppel may arise when there is no intent to mislead. A waiver does not necessarily imply that one has been misled to his prejudice or into an altered position. An estoppel always involves this element.

*Id.* at 387 (quoting *Farm Bureau Mut. Auto. Ins. Co. v. Houle*, 118 Vt. 154, 102 A.2d 326, 330 (1954)).

The court also pointed out that some cases have incorrectly stated that prejudice is an element of waiver. "Prejudice plays no part in ... waiver; it is the voluntary relinquishment of the right to rely on the contractual provision which forms the basis of the waiver." *Id.* at 388.

We will not repeat the court's "extended tour" of the case law applying these doctrines, but the court pointed out and explained the apparent conflict in a number of cases applying these doctrines. *Id.* at 388–89.

As a result of its analysis, the court stated a preference for the application of estoppel when evaluating an insurer's election of a policy defense. "[A]n examination of the cases shows estoppel, with some element of unfairness, lack of notice, or other detriment to the insured, rather than voluntary waiver without such element, is the preferred theory when the insurer elects a policy defense." *Id.* at 388 (quoting *Macalco Inc. v. Gulf Ins. Co.*, 550 S.W.2d 883, 891–92 (Mo.App.1977)).

The court also pointed out that, while estoppel is the preferred theory, waiver is not precluded under appropriate circum-

stances. *Id.* But, absent a clear waiver, the insured must show prejudice before the rule may be invoked. *Id.*

Thus, "[o]nce an insurer denies liability on a given ground, it may not thereafter defend on a different ground." *Id.* (quoting *Morris v. Reed,* 510 S.W.2d 234, 240 (Mo.App.1974)). "It is the announcement of the specific defense which lulls the insured into relying to his detriment and subsequent injury on the insurer's stated position." *Id.* at 389. "No ... estoppel results ... where no prejudice results to the claimant from reliance on the statement of the insurer." *Id.* (citing 44 Am. Jur.2d, Insurance § 1665, 659). However,

> absent a statement which excludes other defenses and upon which the insured reasonably relies in preparing to preserve its claim, estoppel is not applicable. And where the insurer's initial denial is stated in such a way that it reasonably implies the subsequently, but more specifically stated, consistent reason for denial, the insured cannot claim she changed her position or relied to her detriment on the insurer's initial denial; estoppel may not be invoked.

*Id.*[2]

In *Century I,* 23 S.W.3d at 877, we considered the issue of whether CNA was required to assert the policy's "business risk" exceptions as an affirmative defense. However, our analysis of and the conclusions about the continued viability of the "*Hounihan* rule" lend some confusion to the area. We analyzed the issue as follows:

> Although it appears this question was answered in the negative in *Calvert,* 660 S.W.2d at 271, more recent cases may have changed that conclusion....
>
> In sum, until 1994 the *Hounihan, Kammeyer,* and *Calvert* courts held that once an insurer who possessed full knowledge of the facts denied liability on one ground, they could not later assert a different ground.
>
> However, the Supreme Court of Missouri further analyzed this issue in *Green v. City of St. Louis,* 870 S.W.2d 794 (Mo.1994). The *Green* Court cited *Heins Implement Co. v. Missouri Highway & Transportation Commission,* 859 S.W.2d 681, 684 (Mo. banc 1993), and retreated from the previous interpretation of Rule 55.08 stating that if an affirmative defense is not pled it is waived, and held that after *Heins,* issues not raised in the answer are simply not raised in the lawsuit....
>
> The cause is reversed and remanded to the trial court to exercise its sound discretion as to whether to allow CNA to so amend [its answer to include the "business risk" exceptions as an affirmative defense]. *Duncan v. Duncan,* 751 S.W.2d 763, 771 (Mo.App.1988).
>
> \*      \*      \*      \*      \*      \*

*Century I,* 23 S.W.3d at 879–80.

In essence, we rejected the *Hounihan* rule, reasoning that it had been abrogated

---

**2.** *See also Farm Bureau Town & Country Ins. Co. of Mo. v. Crain,* 731 S.W.2d 866, 874 (Mo.App. S.D.1987), holding when company initially denied claim because of failure to cooperate in investigation, it did not waive defense of arson where denial letter expressly stated its intention not to waive other defenses and stated its belief that the fire was of incendiary origin.

Also, waiver and estoppel may not create coverage. For example, in *Lawrence v. New York Life Insurance Co.,* 649 S.W.2d 461, 464 (Mo.App. W.D.1983), we stated that once an insured relies to his detriment preparing to meet a defense, the company "may not shift the grounds of defense after the fact." However, the doctrines of waiver and estoppel are unavailable "to create insurance where it would not otherwise exist" by bringing "within the coverage of an insurance policy risks not covered by its terms or expressly excluded therefrom." *Lawrence,* 649 S.W.2d at 465.

by *Green*. A closer reading of *Green* does not support that conclusion. *Green* did not look at or make a determination regarding the same issue that confronts us in this case. *Green* involved a race discrimination suit, where the employee contended that the trial court erred when it granted summary judgment in favor of the city on the ground of collateral estoppel because the city waived that affirmative defense when it failed to plead it in its answer. *Green*, 870 S.W.2d at 797. The court stated that affirmative defenses not raised in an answer are "simply not raised in the lawsuit"; they are not deemed waived, per se. *Id.* Rather, a defendant who fails to plead an affirmative defense in its answer may seek leave of court to amend the answer to include the omitted affirmative defense. *Id.* The court stated that the right to amend is not absolute, but leave is to be freely given if justice requires. *Id.* The court stated as follows:

> The factors the trial court should consider in determining whether to permit amendment of an answer include: (1) the hardship to the moving party if the request is denied; (2) the reasons for failure to include the matter in a designated pleading; and (3) the injustice or prejudice caused the opposing party if the request is granted.

*Id.*

*Green* dealt with the purely procedural aspects of amending pleadings to introduce an allowable affirmative defense that was previously omitted. The case instructs that, as a general rule, an unpled defense is not waived, but is merely not part of the case. *Id.* The court did not review the body of law applicable to an insurance company's attempt to switch gears and assert a different policy defense, nor did it mention or abrogate the well-established rule that a new defense different from that previously relied on to deny coverage can never be part of the case if estoppel or waiver prevents such.

■ Contrary to being a true exception to Rule 55.33, the "*Hounihan* rule," which is more accurately described in the context of the doctrines of waiver and estoppel, is broader than and distinct from the concepts involved in pleading an affirmative defense as espoused in *Green*. The doctrines of estoppel and waiver relating to the ability of an insurer to assert a ground for denial of coverage are applicable in a variety of contexts, from garnishment to declaratory relief, with the insurer as either a plaintiff or defendant. Affirmative defense would be just one vehicle to assert such a denial.

■ We need not apply the rule's root doctrines of estoppel and waiver to the facts of our case because the rule does not apply. CNA denied liability on a specific ground, which Century was aware of from the beginning. CNA has never tried to deny liability on a different ground or assert a new, inconsistent theory of defense. Its unpled affirmative defense was just not part of the case, and whether it may now be pled is determined by the application of Rule 55.33.

### B. Application of Rule 55.33

■ Century argues that even assuming the *Hounihan* "exception" does not apply, the trial court abused its discretion in granting CNA's motion for leave to amend pursuant to Rule 55.33. We consider whether the trial court erred in allowing CNA to amend under Rule 55.33 and the factors set forth in *Green*.

■ "The decision of the trial court to allow an amendment of a pleading after trial has commenced is a discretionary matter which we will not overturn unless that discretion has been clearly abused." *Lay v. P & G Health Care, Inc.*, 37 S.W.3d

310, 327 (Mo.App. W.D.2000) (citation omitted).

Rule 55.33(a) provides that leave to amend a pleading "shall be freely given when justice so requires." As previously discussed, the court stated as follows in *Green,* 870 S.W.2d at 797:

> The factors the trial court should consider in determining whether to permit amendment of an answer include: (1) the hardship to the moving party if the request is denied; (2) the reasons for failure to include the matter in a designated pleading; and (3) the injustice or prejudice caused the opposing party if the request is granted.

The first factor set forth in *Green* is the hardship to CNA if the request to amend is denied. Century argues that the trial court erred in finding that CNA would suffer hardship were it not permitted to amend its answer because CNA had ample opportunity to plead its affirmative defenses, either during the original litigation or during the appeal, but it failed to do so, despite Century repeatedly calling the pleading deficiency to CNA's attention. Century argues that CNA's decision not to amend constitutes "a known and purposeful relinquishment of its right to rely upon the affirmative defenses," which does not constitute hardship, but rather a cognitive decision not to plead the exclusions.

CNA argues that it would have sustained considerable hardship if the request for leave to amend was denied because it would have been foreclosed from asserting a valid coverage exclusion contained within its insurance policy, and thus it would have been forced to pay for the defense of a claim under circumstances where the insurance policy clearly did not afford the insured the right to a defense.

We agree that CNA would have sustained hardship had its request to amend been denied, for the reasons stated by CNA and the trial court. If its request to amend had been denied, CNA would have been prevented from asserting a contractual defense which may have been dispositive of the case. This factor weighs in favor of CNA.

The second factor is CNA's reasons for its failure to include the matter in a designated pleading. Century argues that the trial court should not have found that CNA stated a sufficient reason for its failure to plead a single affirmative defense in its original answer. Century cites the rule that an insurer bears the burden of pleading and proof as to the applicability of an exclusion in the policy, and CNA disregarded the mandate of the rules of pleading and general insurance law in Missouri, and that is not a sufficient reason for failure to plead its defenses.

■ CNA counters that it did not include the specific policy exclusions in its original answer because its counsel believed that policy exclusions contained with the body of an insurance contract did not constitute an affirmative defense which must be specifically pled in opposition to a claim for breach of the insurance contract. CNA argues that the fact that this was not a clear distinction has been confirmed by this court, which has stated that "[a]lthough there are several cases in Missouri that touch on this issue, none seem to answer the question directly." *Century I,* 23 S.W.3d at 877. Accordingly, CNA contends, its failure to include the specific policy exclusion was not in disregard of any established principle of law. Moreover, CNA argues, in light of the fact that it set forth the policy exclusions in its answers to Century's discovery, it clearly did not intend to conceal these exclusions

until trial.[3]

In light of the fact that the requirement that a defendant must plead an insurance policy exclusion as an affirmative defense was not established until this court considered the issue for the first time in *Century I,* this factor does not weigh against CNA.

The third and final factor is the injustice or prejudice caused to Century if the request to amend is granted. Century argues that the trial court should not have found that Century would not be prejudiced by allowing CNA to amend its answer. Century argues that it has "spent thousands of dollars and countless hours rectifying CNA's untenable position with regard to a very basic requirement of civil procedure." Century claims that Missouri courts recognize such prejudice and prohibit a party from amending a pleading when the party could have amended the pleading earlier in the litigation.

Century concludes that CNA "set on a strategic course not to seek amendment for whatever self-serving reason," and to allow CNA to amend after such behavior is untenable in light of the long-standing presumption in favor of the insured.

CNA argues that Century has not suffered undue prejudice as a result of the amendment because at the time of the trial court's original judgment, Century had known for at least five years that CNA's denial of coverage was based on the "business risk" policy exclusions. On November 9, 1994, CNA claims supervisor Twila Walburn sent a letter to Century's president, Lin McCool, specifically citing policy exclusions 2(n) and 2(m) and the verbatim policy definitions of "your product" and "your work." These are the very policy exclusions upon which the trial court based its conclusion that the policy did not require CNA to provide Century a defense to the underlying lawsuit. In addition, on December 18, 1999, CNA served the following answers to Century's first set of interrogatories:

6. Describe, in detail, the basis for CNA's declination of Century's tender of its defense in the Underlying Lawsuits.

ANSWER: Events giving rise to liability against Century Fire do not constitute an "occurrence" as that term is defined in the policy. Therefore, the claims asserted by Clayco Construction Company do not fall within the purview of the policy's insuring agreement. Additionally, the claims asserted by Clayco Construction are excluded from coverage under the policy by Sections 2(j)(5), 2(k), 2(*l*), 2(m) and 2(n). The claims asserted by Clayco Construction do not indicate a potential for coverage under the CNA policy.

7. Describe, in detail, the basis for CNA's declination of Century's request that CNA indemnify Century in the Underlying Lawsuits.

ANSWER: Events giving rise to liability against Century Fire do not constitute an "occurrence" as that term is defined in the policy. Therefore, the claims asserted by Clayco Construction Company do not fall within the purview of the policy's insuring agreement. Additionally, the claims asserted by Clayco Construction are excluded from coverage under the policy by Sections 2(j)(5), 2(k), 2(*l*), 2(m) and 2(n). The claims asserted by Clayco Construction Company and facts revealed through rea-

---

**3.** Timeliness in asserting an affirmative defense is a consideration when applying the second factor, especially regarding defenses of preclusion such as collateral estoppel, because "a defendant should not be able to hold preclusion in reserve as a 'stealth defense' long after the time for raising substantive defenses has passed." *Heins Implement Co. v. Mo. Highway & Transp. Comm'n,* 859 S.W.2d 681, 685 (Mo. banc 1993).

sonable investigation do not indicate a potential for coverage under the CNA policy.

\* \* \* \* \* \*

Once again, CNA argues, it clearly set forth the basis upon which it was denying coverage, including the specific "business risk" exclusions referenced in CNA's motion for summary judgment. Finally, CNA argues, these exclusions were cited in CNA's motion for summary judgment, and both parties exhaustively argued the merits of whether the "business risk" exclusions applied to defeat coverage. Consequently, Century had ample opportunity to consider, research and argue against application of the "business risk" exclusions. Because Century was afforded repeated actual notice of CNA's intent to rely on the "business risk" exclusions well in advance of the court's determination on the merits of the coverage question, it would be disingenuous for Century to claim that it was unfairly surprised by the exclusions when they were formally included in CNA's answer. Thus, CNA argues, Century suffered no undue prejudice as a result of the amendment.

In response to Century's claim that it has expended a great deal of money and time rectifying CNA's "untenable position with regard to a very basic requirement of civil procedure," CNA argues that to the contrary, Century has actually benefited from this issue, in that this case likely would have been concluded in CNA's favor if not for the pleading issue. Had it included the "business risk" exclusions as affirmative defenses in its answer originally, CNA argues, the trial court's decision on the merits of the coverage question would likely have withstood this court's scrutiny.[4]

We agree that, as previously discussed, Century was afforded ample notice of CNA's plan to rely on the "business risk" exclusions in this case. Therefore, Century did not suffer prejudice or injustice as a result of the trial court's decision to allow CNA to amend its answer.

In conclusion, we hold that in light of the factors set forth in *Green*, the trial court did not err in allowing CNA to amend its answer to include the "business risk" exclusions under Rule 55.33.

## II. Propriety of Summary Judgment

Having held that the trial court did not err in allowing CNA to amend its answer, we next turn to the issue of whether the trial court erred in granting summary judgment in CNA's favor.

In *Century I*, 23 S.W.3d at 877, Century claimed the trial court erred in granting CNA summary judgment based on the policy exclusions because CNA failed to assert the policy exclusions as an affirmative defense in its answer and, therefore, waived such defense. We considered, as a matter of first impression, the issue of whether the application of an insurance policy exclusion is an affirmative defense which must be pled in the trial court by the insurer or be waived. *Id.* We decided the issue in the affirmative, holding that in Missouri a defense based on an exclusion to an insurance policy is an affirmative defense, and the burden to establish the exclusion is on the insurer. *Id.* at 879. We stated as follows:

> Had CNA requested leave to make this amendment, which should have been freely granted by the trial court, this court would now be able to decide this case on the merits rather than on a procedural issue. Although it appears

4. In our opinion, we stated that "it appears that the policy language in question does ex-    clude the claims raised by the party suing Century." *Century I*, 23 S.W.3d at 878–79.

that the policy language in question does exclude the claims raised by the party suing Century, at no time did CNA amend its answer to add the affirmative defense of the policy's "business risk" exclusions, so this court is forced to do just that.

*Id.* at 878–79. We reversed and remanded for the trial court to determine whether CNA should be allowed to amend its answer to include the business risk exclusions as an affirmative defense. *Id.* at 880. Specifically, we stated that "[t]he cause is reversed and remanded to the trial court to exercise its sound discretion as to whether to allow CNA to so amend." *Id.*

On remand, CNA filed a motion for leave to amend its answer to include the business risk exclusions. The trial court granted CNA leave to amend, and CNA amended its answer to include the business risk exclusions.

CNA then filed its second motion for summary judgment, contending that it was entitled to judgment as a matter of law because the trial court had previously ruled in its favor on the issue of whether the insurance policy entitled Century to a defense of the claims asserted in the underlying lawsuit. CNA argued that because that determination was left untouched by the decision of the Court of Appeals and because the trial court granted CNA leave to amend its answer to include the business risk exclusions, the prior judgment of the trial court constituted the law of the case and Century was barred by res judicata from relitigating that issue a second time.

Century filed suggestions in opposition to CNA's second motion for summary judgment, in which it argued that law of the case and res judicata were inapplicable and the exclusions relied on by CNA did not exclude coverage for the loss claimed by Century or, at the very least when taken in context of the whole policy, were ambiguous with respect to coverage of the loss.

The trial court sustained CNA's second motion for summary judgment, holding as follows:

Pursuant to the doctrine of the "law of the case," "a former adjudication is conclusive as to all questions raised directly and passed upon." *Heineman v. Heineman,* 845 S.W.2d 37 (Mo.App.1992). Judge Atwell has rendered a conclusive judgment on the issue of whether the insurance policy provides liability coverage for the claims set forth against Century Fire in the underlying petition. On appeal, the court did not address the issue of whether the insurance policy provided coverage to Century Fire under the circumstances presented. "When a court of appeals reverses a judgment and remands for further consideration of a particular issue, leaving other determinations of the trial court intact, the un-reversed determinations of the trial court normally continue to work an estoppel." Moore's Federal Practice, page 517. In *J.L. Pfau v. T. Breitenburger,* 17 Mo.App. 19 (1885), the court held that it was error for the trial court to make a revision of the judgment as to matters not referred to by the appellate court. Thus, the Court finds that Judge Atwell's ruling on the coverage issue remains the law of the case. Summary judgment in favor of CNA is also appropriate under the principles of res judicata. Res judicata bars the re-litigation of the same cause of action by the same parties or privities in a particular case if the two actions have the following common identities: (1) identity of the thing sued for; (2) identity of the cause of action; (3) identity of the parties to the action; and (4) identity of the quality of the person for or against whom the

claim is made. *State v. Polley*, 2 S.W.3d 887 (Mo.App.1999). In this case, it is clear that the present case is identical in every respect to the cause of action previously decided by the trial court. Therefore, all four of the above "identity" requirements have been met with regard to the central issue of insurance coverage.

\* \* \* \* \* \*

■ We hold that the trial court erred in entering summary judgment on CNA's second motion for summary judgment on the grounds that its first judgment constituted the law of the case and res judicata precluded reconsideration of the coverage issue.

A complete reversal generally annuls the judgment below, and the case is put in the same posture in which it was before the judgment was entered. Thus, after the reversal on appeal, the parties' rights are left wholly unaffected by any previous determination that was reversed, so that a judgment that is reversed and remanded stands as if no trial has yet been held.

5 Am.Jur.2d *Appellate Review* § 861 (1995), and *see* cases cited therein. Our reversal in *Century I* was a complete reversal, rendering the trial court's first judgment null and void.

Century argues that the trial court's original decision on the coverage issue may not be the law of the case because that decision was reversed by this court in *Century I*, thereby rendering that judgment a nullity. We agree.

In *State ex rel. Alma Telephone Co. v. Public Service Commission*, 40 S.W.3d 381, 388 (Mo.App. W.D.2001), we stated as follows in regard to the law of the case doctrine:

The doctrine of law of the case provides that a previous holding in a case constitutes the law of the case and precludes relitigation of the issue on remand and subsequent appeal. The doctrine governs successive adjudications involving the same issues and facts. Generally, the decision of a court is the law of the case for all points presented and decided, as well as for matters that arose prior to the first adjudication and might have been raised but were not. (Citations omitted.)

In *Serafin v. Med 90, Inc.*, 963 S.W.2d 362, 363 (Mo.App. E.D.1998), the eastern district held that the doctrine of the law of the case was inapplicable to a finding of the trial court where the appellate court reversed the lower court's judgment, rendering that judgment a nullity.

Similarly, we hold that the law of the case doctrine is inapplicable to the trial court's determination on the coverage issue in its first judgment because our reversal of that judgment in *Century I* rendered the trial court's original judgment void.

Our opinion in *Century I* certainly did not leave the trial court's determination on the coverage issue "intact." To the contrary, our opinion directed the trial court to determine whether CNA could amend its answer. Depending on the trial court's decision on the amendment issue, the outcome on the coverage issue could have been quite different from the trial court's original determination.

In regard to the applicability of res judicata to the present case, Century argues that even assuming that all the other required elements of res judicata could be satisfied, the doctrine does not apply because a final judgment was not rendered in this case involving the same claims. Again, we agree.

The doctrine of res judicata, or claim preclusion, operates as a bar to the reas-

sertion of a cause of action that has been previously adjudicated in a proceeding between the same parties or those in privity with them. *Robin Farms, Inc. v. Beeler,* 991 S.W.2d 182, 185 (Mo.App. W.D.1999). For res judicata to apply, a final judgment on the merits must have been rendered involving the same claim sought to be precluded in the cause in question. *Id.*

In *Hall v. Wilder Manufacturing Co.,* 316 Mo. 812, 293 S.W. 760, 766 (1927), the Missouri Supreme Court stated as follows:

> It is a principle well settled and of general application that, where a question proper for judicial determination is directly put in issue, and finally determined in a legal proceeding by a court having competent authority and jurisdiction to hear and determine the question, such decision and determination of the question will be deemed final and conclusive upon the parties and their privies, in all further litigation between them in which the same question arises, *so long as the judgment remains unreversed or is not otherwise set aside.*

(Emphasis added.) *See also Lincoln County Ambulance Dist. v. Pac. Employers Ins. Co.,* 15 S.W.3d 739, 746 (Mo.App. E.D.1998) (holding that a judgment vacated on appeal had no res judicata effect on remand); *Robin Farms,* 991 S.W.2d at 186 (holding that when an appellate court vacates a judgment, the lower court's judgment cannot be considered a final judgment on the merits for purposes of res judicata).

Therefore, because this court in *Century I* reversed the trial court's judgment and remanded the case back to the trial court, the trial court's first judgment cannot be considered a final judgment, and res judicata does not preclude reconsideration of the coverage issue by the trial court.

We reverse the trial court's judgment and remand for the trial court to address the coverage issue.

EDWIN H. SMITH and NEWTON, JJ., concur.